**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RAYMOND AND BEVERLY PREUSSER,**
**on behalf of their minor son, E.P.,**

                                                    **Plaintiffs,**

         **vs.**                                                        **1:10-CV-1347**
                                                                        **(MAD/CFH)**

**TACONIC HILLS CENTRAL SCHOOL**
**DISTRICT and JOHN V. GULISANE, JR.,**
**sued in his individual capacity,**

                                                    **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

BERGSTEIN, ULRICH LAW FIRM          Stephen Bergstein, Esq.
15 Railroad Avenue                            Helen G. Ulrich, Esq.
Chester, New York 10918
_Attorneys for Plaintiffs_

GIRVIN & FERLAZZO, P.C.               Patrick J. Fitzgerald, Esq.
20 Corporate Woods Blvd.                  Scott P. Quesnel, Esq.
Albany, New York 12211
_Attorneys for Defendants_

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Plaintiffs Raymond and Beverly Preusser ("plaintiffs" or "R. Preusser" or "B. Preusser"),

on behalf of their minor son, E.P., commenced the within action against defendants claiming that

the Taconic Hills Central School District ("School District") violated Title VI of the Civil Rights

Act. Plaintiffs also assert a cause of action under 42 U.S.C. § 1983 claiming that defendant John

Gulisane ("Gulisane") violated E.P.'s Fourteenth Amendment right to Equal Protection.

Presently before the Court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 19). Plaintiffs have opposed the motion. (Dkt. Nos. 22, 23 and 24).

## BACKGROUND[1]

The facts, unless otherwise noted, are undisputed. E.P. was born in Guatemala in September 1999 and was adopted by plaintiffs shortly thereafter. During the 2009 - 2010 school year, E.P. was in the fifth grade at Taconic Hills Central School District. Sharon Foster ("Foster") was E.P.'s fifth grade teacher. Defendant John Gulisane ("Gulisane") was the Elementary School Principal.

In the Fall of 2009, E.P. gave a presentation to his class about horses. Following that presentation, E.H. (a female student in E.P.'s fifth grade class) and another female student called E.P. "Horsey Boy" and said that the bottom of his cowboy boots smelled like "poop". Foster did not personally hear the students call E.P. "Horsey Boy" but other students in the class reported the incident to Foster. The students who called E.P. "Horsey Boy" were brought to Gulisane's office and were required to apologize to E.P. Gulisane telephoned B. Preusser at her home to discuss the incident and told her that E.P. had been called "Pony Boy" or "Horsey Boy".

Following the October 2009 incident, Gulisane did not receive any further reports of incidents involving E.P. and E.H. until January 2010. Neither B. Preusser or R. Preusser had any further contact with Foster or Gulisane or brought forth any concerns to the School District regarding E.P. until January 2010.

---

[1] Defendants submitted a Statement of Material Facts pursuant to this Court's Local Rules, in support of their motions for summary judgment. Plaintiffs properly responded to the Statement. Therefore, to the extent supported by the record, the background set forth in this section is taken from: (1) defendants' Statement of Material Facts and plaintiffs' responses thereto; (2) the exhibits and evidence submitted by defendants in support of the motion for summary judgment; and (3) the exhibits and evidence submitted by plaintiffs in opposition to defendants' motions for summary judgment. The facts recited are for the relevant time period as referenced in the amended complaint.

On January 8, 2010, an incident occurred in the elementary school cafeteria. When the students in Foster's fifth grade class returned to the classroom following the lunch recess, several students reported to Foster that E.H. told E.P. to "shut up your stupid laugh" and that E.H. told another little boy to pretend to "air shoot" the lunch lady behind her back by using his fingers to represent a gun. The same day, Foster prepared a student disciplinary referral for E.H. and electronically copied Gulisane and Grant Prime ("Prime"). Prime was a fifth grade teacher at the elementary school and the Dean of Students for the fourth and fifth grades.[2] The referral listed the offense as "disrespectful to staff member, did not abide by school rules". The description indicates:

> Several of the students came back from lunch and stated [ ] and a friend were disrespectful to a staff member and a fellow student. When the child would laugh with the other kids, [ ] would tell him "to shut your stupid laugh up". Other children witnessed this. Then [ ] told yet another child to "air shoot" the lunch lady behind her back using his fingers to represent a gun. The child refused to do as [ ] asked him to.

Upon receipt of the disciplinary referral, on the same day, Prime met with E.H. and E.P. and E.H. admitted to her behavior. Prime imposed a punishment on E.H. of two after-school detentions and five days of lunch detention as a result of the incident. Gulisane approved the punishment. Foster called B. Preusser to discuss the incident.

On January 26, 2010, after recess, several students reported to Foster that E.H. teased E.P. in the cafeteria by referring to E.P. as "poopie" and "brownie". E.H. did not directly call E.P. those names and there is no evidence that they were heard by E.P. Rather, there were a series of back and forth conversations between students at various tables in the cafeteria and two or three of E.P.'s friends reported to him that E.H. referred to him as these two names. E.P. confronted

---

[2] At Foster's deposition, she authenticated the report. The parties do not object to the admissibility of the document.

E.H. about the statements and she denied saying them. Upon receipt of this information, Foster prepared a student disciplinary referral.[3] The referral described the offense as "inappropriate language" and the description provides: "[ ] stated during lunch [ ] started to tease [ ]. Although [ ] did not say these things to [E.P] directly, the accused her of referring to him as "poopie" and "brownie". [ ] was upset about the remarks.". The same day, Foster gave the referral to Gulisane and Prime. Gulisane contributed to the disciplinary referral with his own comments[4]:

> [ ] did not admit to saying these things about [ ]. Nevertheless, [ ] will sit on the grade 4 side of the cafeteria to put as much distance as possible between her and []. I will also attempt to have the parties involved resolve issues through mediation.

E.P. also reported the incident to Prime. Upon receipt of the information, Prime immediately went to Foster's classroom to speak with E.H. E.H. denied making the statements causing Prime to bring both E.H. and E.P. to Gulisane's office. Gulisane interviewed E.H. and she continued to deny that she made the statements. Based upon his investigation, Gulisane felt that he needed to take steps to "prevent anymore of this from going on". On the same day, Gulisane telephone plaintiffs to discuss the incident.

On January 27, 2010, Gulisane, R. Preusser, B. Preusser, E.H.'s parents and Columbia County Sheriff's Deputy David Proper met at Gulisane's office to discuss the incident.[5] During the meeting, Gulisane offered the possibility of a non-racial meaning for the term "brownie" or "brown nose".

---

[3] During Foster's deposition, she authenticated the document. The parties do not object to the admissibility of the document.

[4] During Gulisane's deposition, he authenticated this portion of the referral.

[5] The parties and witnesses present conflicting accounts of what transpired during the meeting.

At the conclusion of the meeting, Gulisane advised the parties that he intended to separate E.H. from the other fifth grade students at lunch and require her to sit with the fourth grade students on the other side of a removable partition wall in the cafeteria. Gulisane also stated that he would advise the cafeteria aides to monitor the situation in the cafeteria and that he would instruct Foster to stay on top of the issue and to be aware of the tension between the children. Gulisane also stated that he would personally meet with all of the students involved to discuss the incident and that he would arrange for E.H. and E.P. to meet together with the school's psychologist to discuss and attempt to resolve any issues between them.

Following the January 27, 2010 meeting, E.H. was required to sit on the fourth grade side of the cafeteria. On January 27, 2010 and January 28, 2010, E.P. was absent from school due to a physical illness.

On January 28, 2010, plaintiffs sent a letter to Dr. Mark A. Sposato, the School District Superintendent. The letter indicated, "[w]e are filing a formal complaint of racial discrimination and harassment on behalf of our son, [ ], by a fellow classmate". Plaintiffs stated:

> The racial name calling has been going on for more than three years. In third grade it started; we tried to resolve it at the classroom level but every time my son would go to the teacher, her response was "stop being a tattletail". The racial name calling and harassment has escalated this current school year.
>
> The first racial encounter occurred in October and it involved two classmates. We were called by the principal concerning the matter. He stated that the parents of the two classmates were contacted. Only to find out later that they were not contacted and no report was written up by the principal.
>
> In early January, another incident happened in the cafeteria in which a referral was written up by the teacher.
>
> The latest incident happened on January 26th where [ ] was using racial names against [ ] to a group of classmates.

The letter contained details regarding the January 27, 2010 meeting and a description of how the incidents impacted E.P.

On January 29, 2010, Gulisane met with E.P. and the other students. At that meeting, it was reported that E.H. called E.P. a liar behind his back. Students also reported that when E.P. heard this, he stated that he wanted to "jump over the table and kill E.H." or words to that effect. E.P. admitted to making that statement. During the same meeting, Gulisane told E.P. and his classmates about the importance of being friends, about being sorry for the things "we say to each other" and about not gossiping. Gulisane also told the children to seek out the help of an adult with these issues and not to take these matters into their own hands. Gulisane asked the children to "shake" and be friends but E.P. refused to shake hands with E.H. and walked out of Gulisane's office. E.H. followed E.P. down the hall, called his name and "kept begging [him] and begging [him]" to be her friend and E.P. finally agreed.

After that meeting, Gulisane called B. Preusser at home and told her about the meeting and that he had learned that E.P. made a statement about wanting to jump over the table and kill E.H. Gulisane never indicated that he was going to take disciplinary action against E.P. for that statement. B. Preusser called E.H.'s mother to apologize for E.P.'s actions and told her that she could talk to Gulisane about having E.P. expelled from school. E.P. did not return to school on January 30, 2010 or the beginning part of February 2010 due to an ear infection. While E.P. was out sick, plaintiffs decided to remove E.P. and his younger brother from the School District. E.P. did not return to school at the School District.

No School District employee ever heard E.H. make any racial remark to E.P. Prior to January 26, 2010, plaintiffs never brought E.H.'s behavior to the attention of the Superintendent

of the school district nor did they make any written complaints to anyone in the school district regarding E.H.'s behavior.

On December 8, 2010, plaintiffs filed an Amended Complaint and asserted the following causes of action:

> Through its deliberate indifference to the racial harassment suffered by E.P., defendant school district violated Title VI of the Civil Rights Act of 1964.

> Through his deliberate indifference to the racial harassment suffered by E.P., defendant Gulisane violated the Equal Protection Clause of the U.S. Constitution made actionable by and through 42 U.S.C. § 1983.

(Dkt. No. 6, paragraph numbers omitted).

On March 1, 2012, defendants filed the within motion seeking summary judgment.

## DISCUSSION

**I.    Standard on Motion for Summary Judgment**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56. In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citation omitted). These determinations are within the sole province of the jury. *Id*.

## II.      Title VI Claims Against the School District

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.[6] In order to support a claim under Title VI, a plaintiff must show that: (1) the defendant discriminated on a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's action. *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)). Title VI does not provide for individual liability. *Hickey v. Myers*, 852 F.Supp.2d 257, 267 (N.D.N.Y. 2012). Here, plaintiffs have asserted a Title VI claim against the School District only.

## A.      Deliberate Indifference Standard

---

[6] Defendants do not dispute that the school district received federal funds.

Defendants rely upon the Supreme Court holdings in *Alexander v. Sandoval*, 532 U.S. 275 (2001) and *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) and the Third Circuit case of *Pryor v. Nat'l Coll. Athletic Ass'n*, 288 F.3d 548 (3d Cir. 2002) and argue that plaintiffs must prove that the School District intentionally or purposefully discriminated against E.P. on the basis of his race to sustain a Title VI claim. Defendants also argue that the Second Circuit Summary Order in *DT v. Somers Cent. Sch. Dist.*, 348 F. App'x 697 (2d Cir. 2009) does not provide support for the proposition that purposeful discrimination is measured on the "less strict deliberate indifference standard".

Summary Orders are persuasive authority to the extent that their factual patterns align with the instant case and their reasoning is compelling. *Anwar v. Fairfield Greenwich Ltd..*, 2012 WL 3245478, at *3 (S.D.N.Y. 2012) (citing 2d Cir. R. 32.1.1(a)); *see also Laboy v. Bd. of Tr. of Building Serv.*, 2012 WL 701397, at *2 (S.D.N.Y. 2012) ("[t]he Court is not persuaded that it is at liberty not only to disregard but contradict a Second Circuit ruling squarely on point merely because it was rendered in a summary order." ). In *Somers Cent. Sch. Dist.*, the Second Circuit was confronted with a case of student-on-student harassment and held that, "[u]nder Title VI, a plaintiff may sue a school district for money damages based on alleged student-on-student harassment only if the school district acts with deliberate indifference to known acts of harassment".

In this matter, plaintiffs concede that this lawsuit is based upon "student on student" harassment and the allegation that the School District created a hostile education environment, "characterized by a pervasive atmosphere of racism that hindered E.P.'s access to education, caused him to suffer significant anxiety and eventually transfer from the district". Based upon the factual similarities between *Somers Cent. Sch. Dist.* and the case herein, the Court disagrees with

defendants characterization of the persuasiveness of the *Somers Cent. Sch. Dist*. holding. Moreover, the Court is not compelled to follow the reasoning in *Sandoval* and *Pryor*, as those matters did not involve claims of "student on student" harassment and a hostile education environment. *See Bryant v. Ind. Sch. Dist. No. I-38 of Garvin County, Ok.*, 334 F.3d 928, 931 (10th Cir. 2003).

Most recently, on December 3, 2012, the Second Circuit addressed the deliberate indifference issue. In *Zeno v. Pine Plains Cent. Sch. Dist*. 2012 WL 5992147 (2d Cir. 2012), the Court held that, "[w]e now apply *Davis*' deliberate indifference standard to [the plaintiff's] Title VI claim."[7] *Id*. at.*7, n. 10 . Citing to *Sandoval* and *Davis*, the Court held:

> Title VI prohibits intentional violations of the statute. In certain circumstances, courts view actions of a third party as intentional violations by the funding recipient. For example, in the educational setting, a school district is liable for intentional discrimination when it has been "deliberately indifference" to teacher or peer harassment of a student".

*Id.* at *6.

Therefore, based upon the Second Circuit's holding in *Somers Cent. Sch. Dist*. and *Zeno*, this Court will apply the deliberate indifference standard to plaintiffs' Title VI claims.

**B.      Merits of Hostile Education Environment Claim**

In order to prevail on a hostile education environment claim, plaintiffs must demonstrate: (1) that E.P. was subjected to a racially hostile educational environment; and (2) that the School District was deliberately indifferent to it. *Barnett ex rel. M.B. v. Johnson City Sch. Dist.*, 2006 WL 3423872, *4 (N.D.N.Y. 2006) (internal citations omitted); *see also Rodriguez v. New York Univ.,* 2007 WL 11775, at *6 (S.D.N.Y. 2007) (an educational institution may be liable under

---

[7] *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).

Title VI if it is "deliberately indifferent" to racial harassment to such an extent that the indifference can be seen as racially motivated) (citing *Bryant*, 334 F.3d at 933). A hostile education environment, based upon student-on-student racial harassment can give rise to liability on the part of teachers, administrators, and boards of education if their deliberate indifference to racial harassment can be interpreted as discriminatory. *Gant v. Wallingford Bd. of Educ*., 195 F.3d 134, 140–41 (2d Cir.1999). Deliberate indifference to discrimination can be shown from a defendants' actions or inaction in light of known circumstances. *Id.* The deliberate indifference, "must, at a minimum, cause the student to undergo harassment or make the student vulnerable to it". *Davis*, 526 U.S. at 645. A plaintiff must establish that the defendants' actions were so clearly unreasonable that a fact finder could draw the inference that the defendants wanted the discrimination to continue. *See Gant*, 195 F.3d at 140. To prove deliberate indifference under Title VI, "the plaintiff must set forth facts demonstrating that the school: (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Monroe Woodbury Cent. Sch. Dist*., 2012 WL 4477552, at *14 (citations omitted). The acts of a student cannot be imputed to the school, rather, the plaintiff must allege that school officials had "sufficient knowledge of the harassment that it reasonably could have responded with remedial measures and failed to take such measures". *Rodriguez*, 2007 WL 117775, at *6 (citation omitted). A Title VI claim cannot be premised merely on constructive notice. *Somers Cent. Sch. Dist*., 348 F. App'x at 699; *Zeno*, 2012 WL 5992147, at *7 .

In order to be actionable, the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or

benefits provided by the school". *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999); *see also Barmore v. Aidala*, 2006 WL 1978449, at *7 (N.D.N.Y. 2006) (the harassment must significantly alter the conditions of the plaintiff's educational environment thereby denying him equal access to school's resources and opportunities). The harassment must be "more than episodic; it must be sufficiently continuous and concerted." *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir. 2003) (citation omitted); *see also Lopez v. Webster Cent. Sch. Dist.*, 682 F.Supp.2d 274, 285 (W.D.N.Y. 2010) (the plaintiffs offered no evidence that the harassment was more than episodic, regardless of the adverse effect such harassment may have had on the plaintiff's mental and emotional state); *see McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (holding two or three instances of racially derogatory language alone, extending over a period of two years, was too sporadic and isolated to establish the objective component of a hostile work environment claim), *cert. denied*, ––– U.S. ––––, 129 S.Ct. 404 (2008). Evidence of racial insensitivity on the part of one student is insufficient to establish a claim for a hostile education environment. *See Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *15. ("the utterance of one comment by a student cannot be said to be so severe or pervasive that it would effectively deny [the plaintiff] educational benefits"). The standard requires an environment that is both objectively and subjectively hostile and requires an examination of the totality of the circumstances "including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the victim's academic performance." *Barmore*, 2006 WL 1978849, at *7 (citing *Hayut,* 352 F.3d at 745).

Furthermore, the Court must assess whether the defendant's response to "known discrimination was unreasonable in light of the known circumstances" and whether the remedial

action followed only after a lengthy and unjustified delay.  *TC v. Valley Cent. Sch. Dist.*, 777 F.Supp.2d 577, 596 (S.D.N.Y. 2011) (citing *Hayut*, 352 F.3d at 751).  In some instances, prompt disciplinary action may show that a school was not deliberately indifferent, however, "the sufficiency of the response must be considered in light of the known circumstances".  *Zeno*, 2012 WL 5992147, at *6 (citations omitted).  "The standard is not one of negligence as deliberate indifference is more than a mere reasonableness standard that transforms every school disciplinary decision into a jury question."  *See Valley Cent. Sch. Dist.*, 777 F.Supp.2d at 596.  In cases where a plaintiff asserts that school officials failed to discipline the students that perpetrated the harassment, "[c]ourts should avoid second guessing school administrators decision[s] and should defer to the judgment of those administrations that are importation to the preservation of order in the schools".  *Barnett v. Johnson City Sch. Dist.*, 2006 WL 3423872, at *5 (N.D.N.Y. 2006); *see also Valley Cent. Sch. Dist.* 777 F.Supp.2d at 596.; *see also Somers Cent. Sch. Dist.*, 588 F.Supp.2d at 496 -497 ("[w]hile the Court is mindful that granting summary judgment is a decision not to be made lightly, . . . [g]iven the undisputed facts that the defendants engaged in some forms of investigation into the Cafeteria Incident, even though plaintiffs may have been dissatisfied with the outcome, this Court finds that the defendants' response was not so deliberately indifferent as to be clearly unreasonable").  Courts may consider whether the disciplinary action had a positive outcome, i.e., the victim suffered no subsequent harassment, in determining whether the remedies were reasonable.  *See Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552 at *15.

A plaintiff must also demonstrate that the victim was denied access to educational opportunities.  The Supreme Court has defined the standard for determining whether a student was denied such access as follows:

> It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity .... Rather, a plaintiff must establish ... harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities.

*Zeno v. Pine Plains Cent. Sch. Dist.*, 2009 WL 1403935, at *3 (S.D.N.Y. 2009) (citing *Davis*, 526 U.S. at 651). "The harassment must have a "concrete, negative effect" on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource." *C.S. v. Couch*, 843 F.Supp.2d 894, 907 (N.D.Ind. 2011) (citing *inter alia Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (the record failed to suggest the plaintiff was subjected to student-on-student harassment that was so pervasive, severe, and objectively offensive as to deny her equal access to education when her grades did not suffer, she was not extensively absent from school, she graduated with a class rank of 27 out of over 500, and then enrolled in college)).

In this matter, plaintiffs contend that E.P. was subjected to numerous instances of racially-related name calling and that E.P. was taunted consistently throughout the third and fifth grade. Thus, plaintiffs contend that a jury could reasonably conclude that E.P. endured a hostile education environment. Plaintiffs further claim that the School District's unreasonable delay in responding to the harassment, lack of diversity/anti-harassment programs and failure to investigate is evidence of deliberate indifference. Defendants claim that the school district was not deliberately indifferent to known acts of racial harassment against E.P. Moreover, defendants claim that they took "immediate and reasonable steps to address the circumstances known to it" and further, that E.P. did not suffer any harm as he was not deprived of any educational opportunities or benefits due to racial harassment.

An analysis of plaintiffs' claims involves an examination of the following issues: (1) whether defendants had actual knowledge of the "student on student" harassment; (2) whether E.P.'s educational environment was permeated with racial hostility that was severe and pervasive; (3) whether defendants' response to the harassment was reasonable; and (4) whether racial harassment deprived E.P. of equal access to the schools educational opportunities.

R. Preusser admitted that the January 2010 letter to Dr. Sposato was the only written complaint he made to the School District regarding racial harassment but he claims that the School District was on notice of the alleged harassment as early as the Spring of 2008. R. Preusser testified that while E.P. was in the third grade, he told Gulisane that E.P. told him that E.H. as calling E.P. names including, "Poopy", "Poopy Face" and telling E.P. that he looked like he "got poop smeared all over [his] body". Plaintiffs also testified that they discussed the incidents with Marie Donato, E.P.'s third grade teacher.[8] R. Preusser also testified that he contacted Gulisane after the incident in the Fall of 2009 and told Gulisane that E.H. used words like "Poopy" and "Poopy Face" and "it looks like you smeared poop all over your body or face". The parties agree that following the October 2009 incident, Gulisane did not receive any further reports of incidents involving E.P. and E.H. until January 2010. Moreover, plaintiffs admit that neither B. Preusser or R. Preusser had any further contact with Foster or Gulisane or brought forth any concerns to the School District regarding E.P. until January 2010. B. Preusser claims that between January 8th and January 26th, Gulisane called her "quite a few times" to tell her that E.H. was calling E.P. names and that Gulisane "didn't know how to handle it".

---

[8] In an affidavit in support of defendants' motion for summary judgment, Ms. Donato averred that she never heard any student make racially derogatory remarks to E.P. and it was never reported to her that any such remarks were made.

Defendants claim that they had no knowledge that E.P. was the victim of racial harassment until January 26, 2010. However, given the conflicting testimony and viewing the evidence in a light most favorable to plaintiffs, the Court finds that there is a genuine issue of fact as to whether defendants' were aware that E.P. was the victim of possible racial harassment by E.H. such that the School District could have responded with remedial measures. However, this is does not dispose of defendants' motion as the Court cannot end the inquiry there. Plaintiffs must also establish that defendants' had actual knowledge of harassment that was "severe, pervasive and objectively offensive". *See Barnett,* 2006 WL 3423872, at *6 (N.D.N.Y. 2006) (while there may be a genuine dispute as to whether the plaintiffs' treatment on the bus was reported to school officials, that dispute is immaterial because the evidence established that the treatment was not racially motivated).

E.P. testified about his experiences in third grade. He did not mention being called some of the names described by his father:

> Q. In third grade, how often would E.H. say things to you that made you upset?
> A. She would just say them a lot. I don't know a number or anything. She would just say them every day, every week, every day, every month. A lot.
> Q. Would she say Poopy and Brownie to you in the third grade?
> A. Not Brownie but Poopy.

E.P.'s Dep. at p. 77-78.

Plaintiffs concede that E.P. suffered no racial harassment for an entire year as E.H. and E.P. were not in the same fourth grade class. E.P.'s testimony about the alleged harassment in the Fall of 2009 further belies plaintiffs' claims that the harassment was racially related:

> Q. So after you gave your presentation, she called you Horsey Boy?
> A. Yes.
> Q. Did she call you Pony Boy too?

A.    No.
Q.    So it was Horsey Boy?
A.    Yes.
Q.    And after that presentation, did she call you anything else or was it just Horsey Boy?
A.    Just Horsey Boy.

E.P.'s Dep. at p. 36.

B. Preusser also testified and conceded that no racially-charged language was used during the incident in the Fall of 2009. B. Preusser testified that Gulisane called her to discuss the incident:

Q.    And what was said during that conversation?
A.    He had told me that E. was upset, that two of his classmates had called him names, and that he was going to contact their parents?
Q.    Those two students were E.H. and J.M.?
A.    Yes.

*    *    *

Q.    Pony Boy or Horsey Boy, so those were the terms used in October 2009?
A.    Yes.

B. Preusser Dep. at p. 23.

When asked whether the terms "Brownie" or "Poopy" were discussed during that conversation, plaintiff testified, "I don't remember". Plaintiffs concede that the January 8, 2010 incident was not racially related. The next and last incident of alleged racial harassment occurred on January 26, 2010 when other students heard E.H. referred to E.P. as "Poopy" and "Brownie".

Given the totality of the circumstances and viewing the evidence in the light most favorable to plaintiffs, E.P. suffered less than five specific instances of racially related name-calling over the course of three years. This Court does not condone E.H.'s behavior nor does it intend to minimize the effects that this conduct must have had on E.P. However, no

reasonable juror could conclude, under the circumstances herein, that E.P.'s environment at school was permeated with severe racial hostility. Plaintiff's parents claim that he was subjected to "continuous" name-calling. However, they testified that they were never present, nor did they ever observe, E.H. make any racially derogatory remarks to their son. Moreover, the harassment never involved physically threatening conduct. Plaintiffs cannot sustain a cause of action for a hostile education environment based upon episodic teasing by one student that occurred over a three year period of time.

Even assuming that the evidence established that E.P. suffered from racial harassment that was severe and pervasive, plaintiffs must also establish that defendants' response to the harassment was unreasonable or that defendants were "deliberately indifferent" to the harassment. On January 26, 2010, the same day that the incident occurred, Foster notified Gulisane and Prime about the events in the cafeteria. Upon receipt of such notification, Prime went to Foster's classroom to speak with E.H. and E.P. In addition, Gulisane interviewed E.H. and E.P. and telephoned plaintiffs to discuss the incident. The day after the incident, Gulisane, plaintiffs and E.H.'s parents met at Gulisane's office to discuss the incident. At the conclusion of the meeting, Gulisane outlined his plan for responding to the incident and the measures he intended to take to resolve the issues. The record establishes that Gulisane took the following actions: (1) separated E.H. from the other fifth grade students at lunch; (2) advised cafeteria aides and Foster to "stay on top of the issue"; and (3) scheduled a mediation between E.H. and E.P. with the school counselor, Elena Evans.[9] In addition, on January 30, 2010, Gulisane met with E.P., E.H. and other children to "set the record straight". Gulisane talked about gossiping and about being friends with each other. After the meeting E.H. apologized to E.P. and that name calling stopped. All of the

---

[9] The mediation did not take place.

aforementioned actions occurred within four days of the incident. During that time, E.P. was absent from school for three of the four days. Based upon the record, defendants' response was immediate, thorough and reasonable.

Plaintiffs did not agree with Gulisane's course of action and argue that it was unreasonable because E.H. was punished more severely in early January 2010 for less egregious behavior. Plaintiffs' disagreement over the course of action that the school should have taken is irrelevant to this analysis. *See Maislin v. Tennessee State Univ.,* 665 F.Supp.2d 922, 932 -933 (M.D.Tenn. 2009) (the question is whether the defendant's response was reasonable, not whether the plaintiff would have preferred a harsher punishment); *see also Zeno* 201 WL 5992147, at *8 (victims do not have a right to specific remedial measures). The issue is the adequacy of defendants' response. The Court must give deference to the School District's disciplinary judgment with regard January 26, 2010 incident. Foster, Prime and Gulisane met with students, investigated the incident and issued written reports. Gulisane contacted the student's parents and held face-to-face meetings with the parents and the students to resolve the issues. E.H. was disciplined for her conduct and plaintiffs concede that E.P. suffered no further harassment after Gulisane met with the students.

Plaintiffs admitted that they never asked Foster to "do anything" about the January 26th incident and B. Preusser testified that she never spoke with the Superintendent or Prime. *See Lopez*, 682 F.Supp.2d at 285 (the court considered the fact that the plaintiff did not request that specific action be taken conceding that he could not tell the defendant how to do their job). Plaintiffs offered no alternative suggestions. Indeed, plaintiffs never asked the School District to separate E.H. and E.P. *See Maislin,* 665 F.Supp.2d at 932 -933 (neither the plaintiff nor his father ever requested a roommate transfer or raised the possibility of switching roommates). On January

27, 2010, January 28, 2010 and from January 30, 2010 until "early February 2010", E.P. was out of school with an ear infection.[10]  On February 8, 2010, plaintiffs informed defendants that they were removing E.P. from the school district.  Plaintiffs concede that in response to this information, Gulisane offered a tutor so that E.P. "would not get behind".  *See Lopez*, 682 F.Supp.2d at 284 (the district made reasonable efforts to accommodate the plaintiff but the family was uncooperative).  Based upon the circumstances known to the School District at the time of the incident, no reasonable factfinder could conclude that defendants' response made E.P. vulnerable to more harassment nor could a reasonable jury conclude that defendants were deliberately indifferent.

Plaintiffs argue that defendants were deliberately indifferent because they failed to implement anti-harassment or anti-bullying measures or programs. Courts have rejected this notion finding that "*actually* eliminating harassment is not a pre-requisite to an adequate response".  *Zeno*, 2012 WL 5992147, at *11 (emphasis supplied) (citing *Davis*, 526 U.S. at 648) (the school district cannot be found deliberately indifferent because it failed to offer racial sensitivity training).  Plaintiffs also argue that defendants were deliberately indifferent because the Title IX officer failed to properly investigate the matter but offer no caselaw in support of that assertion.  Upon receipt of a Title IX grievance, a school district is not required to proceed in a particular manner, even if there are policies in place that would appear to require the initiation of a formal investigation.  *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 1521060, at *7 (S.D.N.Y. 2012) (citing *Oden v. Northern Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir.2006) (nine-month delay in convening a hearing in contravention of College policy requiring

---

[10] The record indicates that E.P. was out of school on January 27, January 28 and January 30, 2010 through early February 2010.  E.P. was in school on January 29, 2010.

a hearing within thirty days of formal complaint of harassment did not amount to deliberate indifference)

In this case, Sandra Gardner, the School District's Title IX officer, testified that she received a copy of plaintiffs' January 2010 letter to Dr. Sposato in mid-February 2010. She testified that prior to that time, she was not aware of any complaints because plaintiffs never filled out the Title IX paperwork through the district nor did they ever schedule an appointment to meet with her. Upon receipt of the letter, Gardner contacted legal counsel. At approximately the same time, Gardner learned that plaintiffs also filed a complaint with the Office of Civil Rights. Gardner testified that she assisted in the investigation of the matter, within the context of the Office of Civil Rights complaint. As previously discussed, prior to the Title IX grievance, the School District timely investigated and promptly and reasonably responded to the incident. The School District's response, or alleged lack thereof, to the specific Title IX complaint does not equate to deliberate indifference.

Finally, the Court finds that plaintiffs' claim is fatally flawed because they failed to establish, or even allege that E.P. suffered from a deprivation of educational opportunities. Plaintiffs did not address this issue in their opposition to defendants' motion and the complaint lacks any specific allegation with regard to what resources E.P. was deprived of due to racial harassment. Despite plaintiffs' failure to address this issue, the Court must view the evidence in a light most favorable to the minor plaintiff. District courts have held that removal or withdrawal from school to avoid further harassment may, in some instances, constitute a deprivation of resources. *Smith v. Guilford Bd. of Educ.*, 226 F. App'x 58, 63 (2d Cir.2007) (summary order) (district court failed to construe reasonable inferences in the plaintiffs' favor when it found that student voluntarily withdrew from school where the plaintiffs alleged that student was

"effectively forced of withdraw"); *see also Herndon v. Coll. of Mainland*, 2009 WL 367500, at *26 (S.D.Tex. 2009) ("[e]vidence such as stress-related illness, stomach problems, falling grades, or a student's withdrawal from the school due to fear of harassment can constitute harassment sufficiently severe to deprive the student of an educational benefit"). However, in cases where a plaintiff claims that the decision to withdraw was motivated by a racially hostile environment, there must be a strong nexus between the harassment and the deprivation. *See Zeno,* 2102 WL 5992147, at *9 (citation omitted).

Here, the record establishes that E.P. returned to school only once after the incident due to a physical illness. R. Preusser testified that he told defendants "around February 5, 2010", that they were removing E.P. from school. R. Preusser testified that he did not meet with Gulisane because he "had no desire to" so he "brought the stuff I needed to bring to notify them that I was removing my boys from the school" and gave the forms to the secretary. Between January 26, 2010 and February 5, 2010, plaintiffs never asked school officials to take any action, beyond the actions Gulisane already took, to protect E.P. The record also contains a letter dated June 3, 2010 from E.P.'s pediatrician, Valerie Curry, M.D. While the letter is not in admissible form, the parties have not objected to the authenticity of the report. The letter is addressed "To Whom it May Concern". Dr. Curry stated that in February 2010, during an examination for an ear infection, E.P. reported to her that he was called "poopie" and "brownie" at school. Dr. Curry addressed the issue with E.P.'s parents and, "advised that it would be best for him to be placed at another school". The report also indicates that Dr. Curry previously diagnosed E.P. with post traumatic stress in May 2010.

Based upon the record, the Court concludes that there is insufficient evidence demonstrating a nexus between plaintiffs' decision to remove E.P. and the alleged harassment.

Dr. Curry's letter is dated nearly six months after the incident. Moreover, she did not diagnose E.P. with post traumatic stress until nearly five months after the incident and after E.P. was removed from the School District. Moreover, the record also contains a report from E.P.'s psychologist, Nancy L. Hoag, Ph.D.[11] The report is dated February 9, 2010, only two weeks after the January 26, 2010 incident. Dr. Hoag noted that plaintiffs had already decided to remove E.P. from the School District and stated, "[w]ith respect to Mr. and Mrs. Preussers' decision to transfer E.P. to a different school, I view this as a reasonable step given that they feel that they are now in an adversarial relationship with Taconic Hills because of their decision to file a civil discrimination suit." This report refutes plaintiffs' claim that the decision to remove E.P. was based upon the threat of continued harassment. Indeed, there is no evidence that plaintiffs' immediate decision to remove E.P. would have changed had the district responded differently to the January 26, 2010 incident. *See Curley ex rel. Curley v. Hill*, 2000 WL 1708007, at *4 (S.D.Ind. 2000) (the plaintiffs withdrew their son from school on the day after the incident thus depriving school officials from any opportunity to respond further to the situation); *see also Barmore*, 2006 WL 1978849, at *7 (a reasonable jury could find that if the student suffered from any deprivation, it was the result of the plaintiffs own actions and decisions). In *Curley*, a case with analogous facts, the District Court succinctly summarized the issues:

> When viewed in the light reasonably most favorable to plaintiffs, the facts asserted here would trouble any responsible parent, teacher, or administrator. However, the path for bringing such matters into a federal lawsuit is a difficult and narrow one. The standard is not whether school officials acted reasonably or competently. The standard is whether school officials were deliberately indifferent to known ethnic harassment, and whether such deliberate indifference caused any harm to plaintiffs. Because school officials' actions and inactions before May 2nd did not amount to such deliberate

---

[11] The report is not in proper evidentiary form but the parties do not object to the admissibility of the report.

> indifference, and in light of the Curleys' decision to withdraw Andrew from school after the incident on that day, defendants are entitled to summary judgment on all claims. Defendants' motion for summary judgment is hereby granted. Final judgment will be entered immediately.

*Curley*, 2000 WL 1708007, at *4.

In this matter, the totality of the evidence establishes that defendants' response to the harassment that E.P. suffered from E.H. was not so deliberate as to be motivated by a desire for the harassment to continue. *See Lopez*, 682 F.Supp.2d at 286. Further, E.P. was not deprived of educational opportunities due to the harassment that he suffered from E.H. Accordingly, defendants' motion for summary judgment and dismissal of plaintiffs' Title VI claim against the School District is granted.

## III.    Section 1983 Equal Protection Claim Against Gulisane

Relying upon the same facts, plaintiffs also bring claims under § 1983, alleging that Gulisane was deliberately indifferent to the racial harassment suffered by E.P.[12] Defendants contend that based upon the arguments above, plaintiffs fail to established that E.P. was provided with less protection than other similarly situated students due to his race.

The Equal Protection Clause of the Fourteenth Amendment, which provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To succeed on a § 1983 equal protection claim under the Fourteenth Amendment, plaintiffs must show that E.P; (1) compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible

---

[12] The Second Circuit has not yet decided whether Congress intended to allow for parallel and concurrent claims under Title VI and § 1983. *Somers Cent. Sch. Dist.*, 348 F. App'x at 699. In *Valley Cent. Sch. Dist.*, 777 F.Supp.2d at 597, the district court held that based upon recent Supreme Court precedent, Title VI does not preclude a section 1983 claim. *Id.* (citing *Fitzgerald*, 555 U.S. at 246). Defendants have not addressed this issue. Therefore, this Court will address the merits of plaintiffs' equal protection claims without deciding whether Title VI precludes plaintiffs from bringing § 1983 claims against Gulisane in his individual capacity.

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000); *see also Faccio v. Eggleston*, 2011 WL 3666588, at *10. "A violation of the Equal Protection Clause by a state actor in the school setting can either be through direct action or due to deliberate indifference to student-on-student harassment." *Faccio,* 2011 WL 3666588, at *10 (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009)).

To maintain a claim for equal protection, a plaintiff "must come forward with at least some credible evidence that the actions of the individual [defendants] were motivated by racial animus or ill-will". *Saggio v. Sprady,* 475 F.Supp.2d 203, 208 -209 (E.D.N.Y. 2007) (citing *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002)). In addition, plaintiff must show that he was treated differently than other similarly situated individuals as a result of his race. *Id*. (citing *Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996)). The fact that E.H. and E.P. are of different races is insufficient to raise an issue concerning E.P.'s right to equal protection. *Id*. ("[w]hat plaintiff has done here is simply assume that because she and her assailants are of different races, the [d]istrict's actions must have been stacked against her because of her race. The Second Circuit has repeatedly rejected these kinds of naked inferences").

In this matter, plaintiffs' equal protection claim must be dismissed as a matter of law because they have failed to put forward any evidence to suggest that Gulisane intentionally discriminated against E.P. on the basis of his race. The record lacks any evidence demonstrating that Gulisane refused to take action against E.H. because E.H. and E.P. were of different races. The fact that Gulisane may have offered alternate meanings for the words E.H. uttered does not establish that Gulisane was motivated by race when he attempted to resolve the issues between the students. As stated previously, plaintiffs may disagree with the punishment against E.H., but

there is no showing that Gulisane's efforts to deal with the tensions between the students were motivated by racial considerations. Plaintiffs' claims that Gulisane "went easy on E.H." because "E.H.'s father did not want anything done with his daughter" and "because the district had not implemented any anti-harassment programs". These allegations are conclusory and unsupported by the record. Moreover, there is no evidence that these issues had anything to do with race.

There is no evidence that E.P. was treated differently than other similarly situated students outside of his protected class. *See Barmore*, 2006 WL 1978849, at *11 (the plaintiff conceded that he did not know of any student who received less of a suspension than he was issued for a fight). Plaintiffs cite to no comparable incidents involving a minority student and no evidence that Gulisane's past practices indicate a race-based approach to resolving altercations between students of different races. *See Saggo*, 475 F.Supp.2d at 208 -209.[13]

Accordingly, for the reasons set forth in Part II, defendants' motion for summary judgment and dismissal of plaintiffs' Equal Protection claims against Gulisane is granted.

## CONCLUSION

**It is hereby**

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiffs' complaint (Dkt. No. 19) in its entirety is **GRANTED**.

The Clerk is directed to close the case.

**IT IS SO ORDERED.**

Dated: January 17, 2013
     Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[13] The Court has determined that Gulisane is entitled to summary judgment on plaintiffs' § 1983 claims, thus, the Court declines to address the issue of qualified immunity.